Filed 5/16/13  LA Police Protective League v. City of LA CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LOS ANGELES POLICE PROTECTIVE LEAGUE,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>CITY OF LOS ANGELES et al.,<br><br>  Defendants and Appellants. | B241386<br><br>(Los Angeles County<br>Super. Ct. No. BC437997) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert L. Hess, Judge.  Affirmed.

Silver, Hadden, Silver, Wexler & Levine, Richard A. Levine and Stephen H. Silver for Plaintiff and Appellant.

Carmen A. Trutanich, City Attorney, Carlos De La Guerra, Assistant City Attorney, Wayne H. Song, Gerald Sato and Bruce Monroe, Deputy City Attorneys for Defendants and Appellants.

* * * * * *

After labor negotiations reached an impasse between plaintiff and appellant the Los Angeles Police Protective League (League) and defendants and appellants the City of Los Angeles (City) and the Chief of Police, the Chief of Police unilaterally implemented an administrative order that altered the standard by which police officers could be removed from advanced pay grade and bonus positions. The League sought declaratory and injunctive relief, alleging that the Chief of Police lacked authority to implement the order and that the order amounted to an unconstitutional deprivation of rights. The trial court granted summary adjudication in favor of the City on the lack of authority claim, but following a bench trial found that the order was an unconstitutional impairment of contract. All parties appealed.

We affirm. Former Government Code section 3505.4[1] allowed for a "public agency" to unilaterally implement its last, best and final offer following an impasse. Neither the language of related statutes nor legislative history suggests that an agency's governing body must authorize the implementation. Nonetheless, because police officers maintained a protected property interest in the standard for removal from their advanced pay grade and bonus positions, the trial court properly held the unilateral alteration of that standard was an unconstitutional impairment of contract. Finally, the trial court properly declined to award damages to individual officers because there was no evidence of any action directed against them under the order.

## FACTUAL AND PROCEDURAL BACKGROUND

The League is an employee organization recognized by the City to represent all City-employed police officers, detectives, sergeants and lieutenants with respect to matters involving wages, hours and working conditions. The City is a charter city under state law. According to the City Charter, the Chief of Police is the chief administrative officer of the Los Angeles Police Department (Department).

---

[1]     Unless otherwise specified, all references to Government Code section 3505.4 or to section 3505.4 shall be to "former" section 3505.4 in effect at the time of the parties' dispute.

At all relevant times, through provisions specified in the Los Angeles Police Department Manual (Manual), the Department has provided qualified officers with advanced pay grade and bonus positions, which involve additional compensation above the lowest pay grade for each civil service classification because of the additional duties and/or risks associated with each position. In September 2008, the City notified the League of a proposal to change the process for reassignment and/or deselection from advanced pay grade and bonus positions provided by volume three, sections 763.55 and 763.60 of the Manual. The relevant sections then provided that an officer must have clearly demonstrated his or her failure or inability to satisfactorily perform the duties of the position before being reassigned to a lower pay grade or deselected from a bonus position.[2] The City's proposed change sought to vest the commanding officer with discretion to determine whether a subordinate officer was unwilling or unable to perform the duties of the position before reassignment or deselection.

Between October 2008 and February 2009, League and Department representatives met and negotiated issues concerning the proposed changes. The parties were unable to reach any agreement and an impasse was declared (Impasse). Pursuant to the applicable impasse procedures, the parties jointly agreed to engage in factfinding in an effort to resolve the Impasse.

The August 2009 Factfinding Report and Recommendation (Factfinding Report) recommended that the proposed changes not be implemented. The fact finder reasoned that the proposed standard of review for the commanding officer's decision was ambiguous; the proposal eliminated a "cause" standard, which represented a fundamental balance of protection for the employee and leeway for the employer; and there was no reasoned basis for distinguishing between the protections afforded to advanced pay grade and bonus positions on the one hand, and regular promotions on the other. The fact

---

[2] Section 763.55 of the Manual also permitted reassignment from an advanced pay grade when an officer requested reassignment, when an officer completed a fixed tour of duty in a position or when a position was eliminated.

finder determined he lacked sufficient information to attempt to redraft a proposal that would address those concerns.

In September 2009, the Department rejected the Factfinding Report. The following month, the Chief of Police purported to resolve the Impasse by promulgating Special Order No. 47, which implemented the City's proposed revisions to Manual sections 3/763.55 and 3/763.60. The City Council undertook no action to implement Special Order No. 47. Officers in advanced pay grade and bonus positions at the time of Special Order No. 47's implementation became subject to removal from those positions at the discretion of their commanding officer rather than under the prior good cause standard. Under both the previous provisions and Special Order No. 47, a reassigned or deselected officer had a right to an administrative appeal hearing.

In May 2010, the League filed a complaint seeking declaratory and injunctive relief against the City and the Chief of Police, Charlie Beck. It alleged the Department lacked authority to implement the last, best and final offer following the Impasse and that the implementation of Special Order No. 47 resulted in an unconstitutional deprivation of rights without due process. Following the trial court's order sustaining the City's demurrer with leave to amend, the League filed its operative first amended complaint, which alleged six causes of action for declaratory and injunctive relief. It sought both types of relief in connection with three claims: It again alleged that the Department was without legal authority to unilaterally implement the last, best and final offer following the Impasse and that City Council approval was required; it alleged that Special Order No. 47's replacement standard constituted an unlawful deprivation or infringement of employees' property interest and due process rights; and it alleged that Special Order No. 47 unconstitutionally abrogated employees' vested contract rights. The City answered, denying the allegations and asserting several affirmative defenses.

The trial court denied the City's motion for judgment on the pleadings directed to the first and second causes of action regarding the Department's power to implement Special Order No. 47. Thereafter, the League and the City filed cross motions for summary judgment and, in the alternative, summary adjudication. Following a May 12,

4

2011 hearing, the trial court granted the City's motion for summary adjudication on the first and second causes of action, finding that the applicable statutory scheme did not require the Department to obtain City Council approval before implementing its last, best and final offer following the Impasse. It determined that "under the Los Angeles Administrative Code and Charter, the Chief of Police was required to consult with the Board of Police Commissioners prior to implementing the [Department's] last, best and final offer, but was not required to consult with or to obtain the approval of the City Council, as the [League] has asserted." The trial court further determined that neither the language nor the legislative history of Government Code section 3505.4 required the City Council—as the public agency's governing body—to approve the implementation of a last, best and final offer. It denied summary adjudication on the remaining claims and denied the League's motion in its entirety.

In November 2011, the trial court conducted a bench trial through the submission of briefs, declarations and exhibits, and the argument of counsel. The League submitted the declarations of several officers who averred they accepted advanced pay grade positions with the understanding they would be subject to the good cause standard set forth in the former version of the Manual. It submitted a declaration from its general counsel, who provided copies of documents surrounding the implementation of Special Order No. 47. It also sought judicial notice of excerpts of the City's Administrative Code. The City offered a declaration concerning the administrative appeal process and filed evidentiary objections.

The trial court issued a tentative statement of decision in December 2011 and, after the parties filed objections and requested certain modifications, it filed a final statement of decision in February 2012. The trial court outlined the two questions that it necessarily answered to resolve the case. The first question was whether an officer who holds an advanced pay grade or bonus position has a property interest in continuing to hold that position. Relying on *Brown v. City of Los Angeles* (2002) 102 Cal.App.4th 155 (*Brown*) and *Los Angeles Police Protective League v. City of Los Angeles* (2002) 102 Cal.App.4th 85 (*Police Protective League*), the trial court answered the first question

5

affirmatively.  The second question was "whether the substitution of the commanding officer's discretionary decision that reassignment or deselection is appropriate for the 'clearly demonstrated failure or inability to perform' criterion, effected in Special Order No. 47, is a change which implicates the Constitution's prohibition against impairment of contracts."  On the basis of the foregoing authority, as well as *California League of City Employee Associations v. Palos Verdes Library Dist.* (1978) 87 Cal.App.3d 135 (*California League*), the trial court answered that question affirmatively as well.

The trial court entered judgment which included the issuance of a permanent injunction enjoining the application or enforcement of Special Order No. 47, a declaratory adjudication that employees assigned to advanced pay grade or bonus positions prior to the adoption of Special Order No. 47 possessed a constitutionally-protected property interest in the standard for removal from such positions, and a declaratory adjudication that such employees possessed vested contractual rights to the same standard of removal which could not be abrogated without an impairment of contract prohibited by the federal and state Constitutions.  It thereafter denied the City's motion for a new trial and granted the League's motion for attorney fees.  Both parties appealed.

## DISCUSSION

The League contends the trial court misconstrued the applicable statutory scheme in determining the Chief of Police had the power and authority to implement Special Order No. 47.  It also maintains that the trial court should have awarded reinstatement, back pay and benefits to employees affected by Special Order No. 47.  The City contends the trial court erred in determining that officers maintained a property interest in the "for cause" standard for removal from advanced pay grade and bonus positions and that the implementation of Special Order No. 47 was an unconstitutional impairment of that interest.  We find no merit to any contention.

### I.     Standard of Review.

We review the proper interpretation of a statute and its application to undisputed facts de novo.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415,

6

432; *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531; *Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 851.) Correspondingly, our review of an order granting summary adjudication is de novo. (*Wiener v. Southcoast Childcare Centers, Inc*. (2004) 32 Cal.4th 1138, 1142.) Likewise, notwithstanding the abuse of discretion standard typically used to review the grant of an injunction, when the trial court's order involves the interpretation and application of constitutional provisions, questions of law are raised which are subject to de novo review on appeal. (*Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1333; *In re Lugo* (2008) 164 Cal.App.4th 1522, 1535.) To the extent the trial court made factual findings to resolve disputed issues, we review those findings for substantial evidence. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.)

**II.     The Trial Court Properly Granted Summary Adjudication in Favor of the City on the First and Second Causes of Action.**

In its first cause of action, the League sought a judicial determination that the City's unilateral implementation of Special Order No. 47 violated the Government Code because only a public agency's "governing body" was statutorily authorized to promulgate such an enactment. Its second cause of action sought an order enjoining the implementation of Special Order No. 47 for the same reason. In granting the City's motion for summary adjudication, the trial court evaluated the statutory scheme and determined that neither the language of the applicable statutes and regulations nor legislative history supported the League's claims. We agree.

*A.     Applicable Statutory and Regulatory Provisions.*

Adopted in 1968, the Meyers–Milias–Brown Act (Gov. Code, § 3500 et seq.)[3] (MMBA) governs employee relations between California cities, counties, and special districts, and their employees and employee organizations. (*Claremont Police Officers*

---

[3]     Unless otherwise indicated, all further statutory references are to the Government Code.

7

*Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 630 & fn. 4 (*Claremont Police*).) "The MMBA covers employees of any 'public agency,' a term that embraces all municipalities and local governmental subdivisions of the state, including counties. (Gov. Code, § 3501, subds. (c), (d).)" (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 329.)

The two stated purposes of the MMBA are "to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations" and also "to promote the improvement of personnel management and employer-employee relations within the various public agencies in the State of California by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice and be represented by those organizations in their employment relationships with public agencies." (§ 3500, subd. (a); see *Claremont Police, supra*, 39 Cal.4th at p. 630.) To carry out those goals, the MMBA provides public employees with the right to organize collectively and to be represented by employee organizations (§ 3502), and obligates employers to meet and confer with employee representatives about matters that fall within the "scope of representation" (§§ 3504, 3505). (*Claremont Police, supra*, at p. 630.) "Even if the parties meet and confer, they are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue. [Citation.]' [Citation.]" (*Ibid*.)

In 2000, the Legislature added former section 3505.4 to the MMBA, and at the time Special Order No. 47 was implemented the statute provided: "If after meeting and conferring in good faith, an impasse has been reached between the public agency and the recognized employee organization, and impasse procedures, where applicable, have been exhausted, a public agency that is not required to proceed to interest arbitration may implement its last, best, and final offer, but shall not implement a memorandum of understanding. The unilateral implementation of a public agency's last, best, and final offer shall not deprive a recognized employee organization of the right each year to meet

8

and confer on matters within the scope of representation, whether or not those matters are included in the unilateral implementation, prior to the adoption by the public agency of its annual budget, or as otherwise required by law."

Section 3501, subdivision (c) defines a "public agency" to include "every governmental subdivision, every district, every public and quasi-public corporation, every public agency and public service corporation and every town, city, county, city and county and municipal corporation, whether incorporated or not and whether chartered or not."[4] The MMBA authorizes "[t]he governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body" to meet and confer in good faith with representatives of recognized employee organizations. (§ 3505.)

"[S]ection 3500 reserves to local agencies the right to pass ordinances and promulgate regulations consistent with the purposes of the MMBA." (*Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, 63.) Relevant here, the City of Los Angeles Administrative Code includes "[t]he City's Employee Relations Ordinance (ERO) No. 141527 (L.A. Admin. Code, ch. 8, § 4.800 et seq.) [which] establishes 'policies and procedures for the administration of employer-employee relations in City government, the formal recognition of employee organizations and the resolution of disputes regarding wages, hours and other terms and conditions of employment.' (ERO, § 4.800.)" (*Service Employees Internat. Union v. City of Los Angeles* (1994) 24 Cal.App.4th 136, 139.) According to section 4.870(b)(5) of the Administrative Code, the management representative of an agency is vested with the authority "[i]f, after a reasonable period of time, agreement is not reached, [to] review the matter with the determining body or official to determine what further action should be taken." The Los Angeles City Charter, in turn, provides that the Board of Police

---

[4]    We find no merit to the League's argument—made for the first time in its reply brief—that the Department is not a public agency. (E.g., *Brumer v. City of Los Angeles* (1994) 24 Cal.App.4th 983, 987 ["a police department is a public agency and a public entity"].)

9

Commissioners is the "determining body" of the Department, while the Chief of Police is the Department's "management representative" (L.A. Admin. Code, ch. 8, § 4.870(a)(2); City Charter, §§ 506(a), 574).

**B.     The Statutory Scheme Permitted the Chief of Police to Implement Special Order No. 47.**

The League maintains that section 3505.4 must be construed to require that the City's "governing body," or City Council, implement the Department's last, best and final offer following the Impasse. The trial court ruled that the omission of such a requirement in the language of the statute was dispositive: "Section 3505.4 is not ambiguous. It permits a public agency to implement a last, best and final offer, and does not require the approval of the 'governing body.' No resort to the legislative history is necessary."

Our task in construing a statute is to ascertain the legislative intent to permit us to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) "'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls. [Citation.]" (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818.) In other words, if the statutory language is unambiguous, the plain meaning governs and it is unnecessary to resort to extrinsic sources to ascertain legislative intent. (*Kavanaugh v. West Sonoma Union High School Dist., supra,* 29 Cal.4th at p. 919.)

We agree with the trial court that section 3505.4 is unambiguous. It expressly allows a "public agency" to "implement its last, best, and final offer" following the exhaustion of applicable impasse procedures. (§ 3505.4.) The statute contains no mention of any requirement that a public agency's "unilateral implementation" of its last, best and final offer must be conducted through its governing body. (*Ibid*.) To impose such a requirement would run afoul of the principle of statutory construction "'that every

10

word excluded from a statute must be presumed to have been excluded for a purpose.'" (*Arden Carmichael, Inc. v. County of Sacramento* (2001) 93 Cal.App.4th 507, 516, fn. omitted; see also *Dina v. People ex rel. Dept. of Transportation* (2007) 151 Cal.App.4th 1029, 1044 ["We will not read into the statute a restriction that is not there"]; *Mares v. Baughman* (2001) 92 Cal.App.4th, 672, 677 ["'In construing the statutory provisions a court is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language'"]; *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1503 ["We may not speculate that the Legislature meant something other than what it said, nor may we rewrite a statute to make express an intention that did not find itself expressed in the language of that provision"].)

We find no merit to the League's contention that references to an agency's governing body in other parts of the statutory scheme require us to infer the Legislature intended to impose the same limitation in section 3505.4. The League points specifically to section 3505.1, which requires that when public agency representatives and a recognized employee organization reach an agreement, they must present a written memorandum of understanding "to the governing body of the agency or its statutory representative for determination." (See *Bagley v. City of Manhattan Beach* (1976) 18 Cal.3d 22, 25.) It argues that it is inconsistent for the Legislature to have required a governing body to approve a memorandum of understanding but not the resolution of an impasse. (See *Neily v. Manhattan Beach Unified School Dist.* (2011) 192 Cal.App.4th 187, 192 ["The various parts of a statute, or of a statutory scheme, must be harmonized by considering a particular clause or section in the context of the statutory framework as a whole"].)

Typically, however, "[w]hen one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates that the Legislature intended to convey a different meaning. [Citations.]" (*Louise Gardens of Encino Homeowners' Assn., Inc. v. Truck Ins. Exchange, Inc.* (2000) 82 Cal.App.4th 648, 657; accord, *Hassan v. Mercy American River Hospital, supra,* 31 Cal.4th at p. 716

11

["words should be given the same meaning throughout a code unless the Legislature has indicated otherwise"].)  To adopt the League's construction of section 3505.4 would require us to ignore well-established principles of statutory construction as well as other parts of the statutory scheme.  For example, section 3501, subdivision (c) expressly defines a "public agency" as distinct from its governing body.  Moreover, other provisions of the MMBA allow a public agency to act through a variety of means.  (See § 3504.5, subd. (a) [requiring that notice to an employee organization of any ordinance, rule, resolution, or regulation affecting it be provided by "the governing body of a public agency, and boards and commissions designated by law or by the governing body of a public agency"]; § 3505 [enabling the "governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body" to meet and confer with representatives of recognized employee organizations]; § 3507, subd. (a) [providing that a "public agency may adopt reasonable rules and regulations after consultation in good faith with representatives of a recognized employee organization"].)  These provisions demonstrate that the Legislature's omission of any qualifying provision in former section 3505.4 was not inadvertent and reflects a legislative intent to permit a public agency to implement its last, best and final offer after an impasse.[5]  (See *In re Young* (2004) 32 Cal.4th 900, 907 ["'Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent"].)

We likewise reject the League's argument that the trial court was prohibited from relying on the Los Angeles City Charter and the Los Angeles Administrative Code in concluding the Chief of Police had the authority to implement Special Order No. 47.  The MMBA is designed to work in harmony with local laws and is not intended to supersede charters, ordinances or rules that provide for the administration of employer-employee

---

[5]     That section 3505.4 specifically provided "a public agency . . . shall not implement a memorandum of understanding" likewise indicates the statute was intended to have a different meaning than section 3505.1.

12

relations. (§ 3500, subd. (a).) Illustrating how the MMBA and a city charter may work in tandem, the court in *United Public Employees v. City and County of San Francisco* (1987) 190 Cal.App.3d 419, 423, held that because section 3505.1 did "not prescribe the manner in which an agreement between a local government and an employee organization should be put into effect—in fact, it is silent as to what occurs after a nonbinding memorandum of understanding is submitted to the governing body 'for determination,'" a city could require as part of its charter a "provision requiring voter approval of any 'addition, deletion or modification' of city employee benefits." Here, similarly, because section 3505.4 is silent as to how a public agency may unilaterally implement its last, best and final offer, the trial court properly considered the powers and responsibilities granted to the Chief of Police by the Administrative Code and the City Charter to find that he had the authority to act on the Department's behalf in implementing Special Order No. 47 (see L.A. Admin. Code, § 4.870(b)(5); City Charter, §§ 506(a), 574). (See also *United Public Employees v. City and County of San Francisco, supra,* at p. 422 ["City charters are construed to permit the exercise of all powers not expressly limited by the charter or by superior state or federal law"].)

Finally, the League argues that, at a minimum, the language of section 3505.4 is ambiguous, requiring us to evaluate legislative history in construing it. Though we find no ambiguity, "[r]eviewing courts may turn to the legislative history behind even unambiguous statutes when it confirms or bolsters their interpretation, and that is the case here. [Citations.]" (*In re Gilbert R.* (2012) 211 Cal.App.4th 514, 519, fn. omitted.) Section 3505.4 was designed to remedy the result reached in *Cathedral City Pub. Safety Management Assn. v. City of Cathedral City* (1999) 72 Cal.App.4th 821, ordered depublished September 15, 1999, where the Court of Appeal affirmed the city's decision to unilaterally impose a multi-year MOU over the objection of the employee police association. (See Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 1852 (1999-2000 Reg. Sess.) July 7, 2000.) The Legislature intended for the bill to prohibit a public agency from unilaterally implementing a memorandum of

13

understanding following an impasse. (Sen. Rules Com., Office of Sen. Floor Analyses, Assem. Bill No. 1852 (1999-2000 Reg. Sess.) as amended June 19, 2000.)

Nowhere, however, in the hundreds of pages of legislative history submitted in connection with the summary adjudication motions is there any mention of requiring a public agency's governing body to approve the implementation of a last, best and final offer following impasse. We are not persuaded that the isolated legislative comments relied on by the League suggest that the Legislature intended to require a public agency's governing body to resolve an impasse. (See *Medical Board v. Superior Court* (2003) 111 Cal.App.4th 163, 179 ["We rely on the legislative history of an ambiguous statute as dispositive only when that history is itself unambiguous"].) For instance, the statement in the Legislative Counsel's Digest that "[t]he Meyers-Milias-Brown Act requires the governing body of a local public agency to meet and confer in good faith" accurately reflects what is required by section 3505 during the meet and confer process; it does not suggest that the governing body must be involved in the implementation of a last, best and final offer, particularly considering that the Digest's comments in the following paragraph regarding that process do not reference the governing body.[6] (Legis. Counsel's Dig., Assem. Bill No. 1852 (1999-2000 Reg. Sess.).) Similarly, the Enrolled Bill Report's comment that "AB 1852 does not attempt to amend or undermine any existing negotiation process, impasse resolution procedure, or mediation" does not assist the League, given that there was no preexisting statutory requirement limiting the

---

[6] According to the Legislative Counsel's Digest concerning section 3505.4: "This bill would permit a public agency that is not required to proceed to interest arbitration to implement its last, best, and final offer, if after meeting and conferring in good faith, an impasse has been reached between the parties, and impasse procedures, where applicable, have been exhausted, but would prohibit the public agency from implementing a memorandum of understanding. The bill would provide that the unilateral implementation of a public agency's last, best, and final offer shall not deprive a recognized employee organization of the right each year to meet and confer on matters within the scope of representation prior to the public agency adopting its budget or as otherwise required by law." (Legis. Counsel's Dig., Assem. Bill No. 1852 (1999-2000 Reg. Sess.).)

authority to implement an impasse resolution to an agency's governing body. (See Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 1852 (1999-2000 Reg. Sess.) July 7, 2000.) Finally, the comment in the Enrolled Bill Report that California's impasse and mediation process is "similar" to that in states requiring action by a legislative body fails to demonstrate that the Legislature intended to implement the same statutory scheme. (*Ibid*.) Indeed, though the California process and New York process described in the report bear similarities, the report identified several distinct features of the New York process, including a preliminary mediation process, the use of a factfinding "board" and the requirement that the legislative body "take action deemed in the best interest of the public . . . ." (*Ibid*.) The final requirement in particular stands in sharp contrast to the MMBA's permitting the "unilateral implementation" of the public agency's last, best and final offer. (§ 3505.4.)

Nor are we persuaded that the Legislature's subsequent amendments to the MMBA reveal a legislative intent contrary to the language of section 3505.4. As originally introduced in February 2011, Assembly Bill No. 646 was an act to amend sections 3505 and 3505.2, to add section 3505.5 and to repeal and add section 3505.4. (Legis. Counsel's Dig., Assem. Bill No. 646 (2011-2012 Reg. Sess.), p. 1.) As part of the second amendment to the bill, the Legislature modified the act to add sections 3505.5 and 3505.7 and to repeal and add section 3505.4. (Legis. Counsel's Dig., Assem. Bill No. 646, as amended May 5, 2011 (2011-2012 Reg. Sess.), p. 1.) As part of section 3505.7, the Legislature added a provision that "would prohibit a public agency from implementing its last, best, and final offer until at least 10 days after the fact finders' written findings of fact and recommended terms of settlement have been submitted to the parties and the agency has held a public hearing regarding the impasse." (Legis. Counsel's Dig., Assem. Bill No. 646, as amended May 5, 2011, at p. 2.) In turn, the Legislature added a new section 3505.4 which set forth in detail new factfinding procedures that must follow a failed mediation. (Legis. Counsel's Dig., Assem. Bill No. 646, as amended May 5, 2011 at pp. 4-5.)

15

Though the League argues that the public hearing provision was merely a clarification of existing law, thus supporting its position that the governing body was required to implement any impasse resolution, legislative history belies its claim. The Legislature did not merely amend section 3505.4; it repealed and then added a new section 3505.4 to address a new factfinding process, and added a new section 3505.7 to address the procedures that must follow the newly enacted mediation and factfinding processes. (See Assem. Com. on Pub. Employees, Retirement and Soc. Security, Analysis of Assem. Bill No. 646 (2011-2012 Reg. Sess.) as amended March 23, 2011 pp. 1-2.) We "presume from the repeal of a statute an intent to effect a substantial change in the law. [Citation.]" (*Sanford v. Garamendi* (1991) 233 Cal.App.3d 1109, 1119; accord, *Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221, 1233 ["'courts will not infer that the Legislature intended only to clarify the law unless the nature of the amendment clearly demonstrates that this is the case [citation] or the Legislature itself states in a particular amendment that its intent was to be declaratory of the existing law'"].) Accordingly, we presume that Assembly Bill No. 646 was intended as a change in the law and its enactment therefore fails to show that in 2009 the Department's Chief of Police lacked authority to implement Special Order No. 47. Summary adjudication was properly granted.

## III. The Trial Court Properly Ruled That Special Order No. 47 Was Constitutionally Infirm.

Following a bench trial on the League's remaining claims, the trial court ruled in a statement of decision that because there was "no serious question that the changes which Special Order No. 47 seeks to impose would remove the limitations on reassignment or deselection which had previously existed," case law compelled the conclusion that those changes constituted a violation of a protected property interest. Accordingly, the trial court determined that employees assigned to advanced pay grade and/or bonus positions prior to the implementation of Special Order No. 47 "possessed a property interest in the standard for removal from such positions" within the meaning of the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California

16

Constitution. It further ruled that "representative employees who were duly assigned to advanced pay grade and/or bonus positions prior to the adoption of Special Order No. 47 possessed vested contractual rights to that same standard of removal from such positions which could not be abrogated without an impairment of contract within the meaning of Article I, Sec. 10 of the United States Constitution and Article I, Sec. 9 of the California Constitution."

The City's challenge to the trial court's determination is twofold. First, it contends the trial court mischaracterized the nature of the property interest arising from the Manual's standard of removal from advanced pay grade and bonus positions, asserting that no constitutional violation arose from the change in standard as applied to the class of employees as a whole. Second, it asserts the standard for removal was not a fundamental vested right subject to analysis under the contracts clause of the federal and state Constitutions. We find no merit to either challenge.

### A. *Officers Possessed a Property Interest in the Standard for Removal.*

The Courts of Appeal in *Brown, supra,* 102 Cal.App.4th 155 and *Police Protective League, supra,* 102 Cal.App.4th 85 addressed the rights that arise from the advanced pay grade and bonus positions outlined in sections 763.55 and 763.60 of the Manual. *Police Protective League* involved a challenge to an administrative order which set forth new procedures for administrative challenges by officers who had been reassigned to lower pay grades or deselected from bonus positions. There, the League argued that the requirement that good cause be shown for reassignment or deselection created a property interest in the positions subject to due process under the federal and state Constitutions, and that the administrative order failed to satisfy minimum due process guarantees by, among other things, placing the burden of proof on the officer challenging the reassignment or deselection. (*Police Protective League, supra,* at p. 89.)

Though the trial court rejected the League's argument, the Court of Appeal reversed, holding "that a reduction in pay grade or reassignment from [a] bonus position constitutes a property interest subject to due process protections." (*Police Protective League, supra,* 102 Cal.App.4th at p. 91.) Adopting the reasoning of an unpublished

17

decision, the court explained: "'In our view, section 763.60 does more than create an entitlement to an administrative appeal process. By providing an officer may suffer a reduction in pay grade for certain specified reasons and under limited certain conditions, section 763.60 implicitly restricts the Department's authority to initiate a "reduction in pay grade" to the specified reasons. The limitations Section 763.60 imposes on the Department's ability to act give rise to a property interest subject to due process protections.'" (*Id*. at pp. 90–91.) It further concluded that the administrative order failed to afford the minimal procedural safeguards necessary to protect that property interest because it relieved the Department of the burden of proof at any administrative hearing. (*Id*. at pp. 92–94.) The court found the administrative order deficient in that "[t]here is no requirement that the Department establish the requirements for reducing the officer's pay grade as set out in Department Manual sections 763.55 and 763.60, and no requirement that it present any evidence at all." (*Id*. at p. 93.)

One day later, the court in *Brown* similarly held that a property interest arose from the advanced pay grade and bonus position process. (*Brown, supra*, 102 Cal.App.4th at pp. 168–172.) There, an officer was downgraded from his advanced pay grade position in connection with a disciplinary proceeding, and the court concluded that the reduction in pay grade implicated a property interest that was insufficiently protected by the procedures set forth in the same administrative order at issue in *Police Protective League*. (*Brown, supra*, at p. 175.) In finding a property interest in the advanced pay grade and bonus positions, the court described how selection standards or rules may give rise to a property interest: "California state law or a city rule or regulation may confer a property interest in a benefit if it imposes particularized standards or criteria that significantly constrain the discretion of the city with respect to that benefit. [Citation.] A statute, rule or regulation may create an entitlement to a governmental benefit either if it sets out conditions under which the benefit must be granted or if it sets out the only conditions under which the benefit may be denied. [Citation.]" (*Id*. at pp. 169–170.) Applying those principles to the advanced pay grade and bonus positions provided by the Manual, the court held that "by providing that an officer may be subjected to a reduction in pay

18

grade for specified reasons and under certain conditions, Sections 763.55 and 763.60 restrict the Department's authority to initiate a reduction in pay grade to those specified reasons. The express language in those sections imposes certain restrictions on the Department's decisionmaking authority, thus creating expectations and entitlements which are sufficient to give rise to a property interest within the meaning of the due process clause." (*Id.* at p. 171.) Correspondingly, the court held that the administrative order, "by failing to acknowledge the requirement that the Department meet the burden of proof as to certain criteria set out in the manual, and by failing to require the hearing officer or the chief of police to base its decision on such criteria, fails to afford even the most minimal safeguards to protect the erroneous deprivation of Brown's property interest." (*Id*. at p. 177.)

Notwithstanding the clarity and consistency of this authority, the City maintains it does not support the judgment. It argues that the trial court's conclusion that officers "possessed a property interest in the standard for removal from such positions" is an unwarranted extension of the conclusion in *Police Protection League* and *Brown* that the officers possessed a property interest in the positions themselves. We disagree. The *Brown* court could not have been more direct in explaining that the selection process— and hence the deselection and reassignment process—is what creates the property right, stating "that the Department Manual imposes sufficiently specific and substantive criteria controlling the Department's discretion as to create a property interest in the pay grade." (*Brown, supra*, 102 Cal.App.4th at p. 172.) Similarly, the *Police Protective League* court specifically described the reassignment and deselection process, emphasizing the restrictions it imposed on the decision maker and concluding: "'In our view, section 763.60 does more than create an entitlement to an administrative appeal process. By providing an officer may suffer a reduction in pay grade for certain specified reasons and under limited certain conditions, section 763.60 implicitly restricts the Department's authority to initiate a "reduction in pay grade" to the specified reasons.'" (*Police Protection League, supra,* 102 Cal.App.4th at p. 90.) It was precisely "'[t]he limitations Section 763.60 imposes on the Department's ability to act'" that gave rise to the

19

protected property interest. (*Id.* at pp. 90–91.) On the basis of this authority, the trial court properly ruled that the officers assigned to advanced pay grade or bonus positions before the implementation of Special Order No. 47 possessed a property interest in the processes by which they were reassigned or deselected from those positions.

**B.** **Elimination of the "For Cause" Standard for Removal Amounted to an Unconstitutional Impairment of Contract.**

Both the United States and California Constitutions specifically incorporate clauses prohibiting impairment of contracts. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) "Pursuant to these clauses, the state's ability to modify its own contracts with other parties, or contracts between other parties, is limited. [Citations.]" (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1026; accord, *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 783.) With respect to public employment contracts, "California cases clearly establish that although the conditions of public employment generally are established by statute rather than by the terms of an ordinary contract, once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights arising from the legislative provisions that establish the terms of the employment relationship—rights that are protected by the contract clause of the state Constitution from elimination or repudiation by the state." (*White v. Davis* (2003) 30 Cal.4th 528, 566.)

Having concluded that officers possessed a property interest in the Manual's standard for removal from advanced pay and bonus positions, the trial court further determined that Special Order No. 47's unilateral abrogation of that standard was an unconstitutional impairment of contract. In reaching this conclusion, it relied on *California League, supra,* 87 Cal.App.3d 135. There, the Library District's board adopted personnel polices and procedures that included a two-percent longevity salary increase awarded at the end of nine years of service and at three-year increments thereafter; a fifth week of vacation for full-time employees with 10 continuous years of service; and a four-month paid sabbatical for librarians after six years of full-time service. (*Id.* at p. 137.) Approximately nine years after those benefits were implemented, the

20

board offered employees an approximate six percent salary increase conditioned on the elimination of the three benefits. When the parties were unable to reach a memorandum of understanding, the board unilaterally implemented its proposal, thereby eliminating the three benefits for all employees who had not reached the specified years of service. (*Ibid*.)

The Court of Appeal affirmed an order compelling reinstatement of the benefits. (*California League, supra,* 87 Cal.App.3d at pp. 139–141.) It explained that "public employment gives rise to certain obligations which are protected by the contract clause of the Constitution," and cited cases applying the principle not only to salary and pension rights but also to rules and regulations adopted by a board of education, a multi-step classification and pay plan, and a department manual's hearing procedures. (*Id*. at p. 139.) With respect to the eliminated benefits in question, the appellate court agreed with the trial court's characterization of them as "maturing emoluments for continued service" and concluded "that the benefits were important to the employees, had been an inducement to remain employed with the district, and were a form of compensation which had been earned by remaining in employment." (*Id*. at pp. 138, 140.) Accordingly, the court held the benefits were fundamental vested rights not subject to unilateral termination. (*Id*. at pp. 139–141.)

The City argues that *California League* is inapplicable because benefits are not equivalent to a standard for removal and that subsequent criticisms of the case reveal the flaws in its analysis. Addressing the first argument, *Brown, supra*, 102 Cal.App.4th at page 171 concluded that the standard for removal was a benefit that the Department had committed to providing, stating the Manual's restrictions on the decision maker's authority to initiate the reassignment or deselection process were what created the "expectations and entitlements" giving rise to the officers' property interest. (Cf. *In re Marriage of Lehman* (1998) 18 Cal.4th 169, 191 ["the constitutional prohibition against impairment of contracts had been held to preclude a public employer from unilaterally withdrawing even nonvested pension rights which have already been earned by the employee's performance of work"]; *American Federation of Teachers v. Oakland*

21

*Unified Sch. Dist.* (1967) 251 Cal.App.2d 91, 97 ["Rules and regulations adopted by a board of education are, in effect, a part of a teacher's employment contract and the teacher is entitled to their enforcement"].)

Second, the City correctly points out that two subsequent cases have not followed *California League.* But each of those cases involved benefits that were not constitutionally protected. (See *San Bernardino Public Employees Assn. v. City of Fontana* (1998) 67 Cal.App.4th 1215, 1223–1224 [declining to find public employees had any expectation in annual leave and longevity pay benefits that were earned on a year-to-year basis under previous MOU's that expired annually by their own terms]; *San Diego Police v. San Diego Retirement System* (9th Cir. 2009) 568 F.3d 725, 738–739 [prospective salary reduction for certain employees not a vested contractual benefit entitled to protection under the Constitution's Contract Clause].)

Moreover, the court in *Thorning v. Hollister School Dist.* (1992) 11 Cal.App.4th 1598 expressly followed *California League.* There, a school district board initially voted to pay for post-retirement health benefits for retiring employees, but later reopened the matter and voted to suspend payment. (*Thorning v. Hollister School Dist., supra,* at p. 1602.) The court relied on *California League* to conclude that the benefits were contractually vested and shared the qualities found significant in that case: "They were included in District's official declaration of policy pertaining to remuneration and other benefits for board members. They were of importance to the board members as an inducement for their continued service on the board and as a factor in their decision to retire. Thus, under the criteria of *California League,* the benefits are fundamental and District may not unilaterally terminate them. [Citation.]" (*Thorning v. Hollister School Dist., supra,* at p. 1607.) More recently, our highest court acknowledged the continued viability of *California League.* (See *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1190 [acknowledging criticism by other courts that the analysis in *California League* failed to analyze the intent to create vested rights, but stating "none of this criticism purports to quarrel with the underlying theory in

*California League* that public employee benefits, in appropriate circumstances, could become vested by implication"].)

Accordingly, *California League* supports the trial court's conclusion that the Department's unilateral abrogation of the standard for removal was an unconstitutional impairment of contract. Even if we were to engage in a more extensive constitutional analysis not found in *California League*, we would find no basis to disturb the trial court's ruling. In *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048, the court explained and applied the three-step analysis utilized in federal impairment of contract cases: "The first and threshold step is to ask whether there is any impairment at all, and, if there is, how substantial it is. [Citation.] If there is no 'substantial' impairment, that ends the inquiry. If there is substantial impairment, the court must next ask whether there is a 'significant and legitimate public purpose' behind the state regulation at issue. [Citation.] If the state regulation passes that test, the final inquiry is whether means by which the regulation acts are of a 'character appropriate' to the public purpose identified in step two." (*Id.* at pp. 1054–1055, citing *Energy Reserves Group v. Kansas Power & Light* (1983) 459 U.S. 400, 412.)

There can be no question that the elimination of a "for cause" standard is a substantial impairment. (*Mendoza v. Regents of University of California* (1978) 78 Cal.App.3d 168, 175 ["It is, of course, widely recognized that if the employee is subject to discharge only for cause, he has a property interest which is entitled to constitutional protection"]; accord, *Brown, supra*, 102 Cal.App.4th at p. 172; *Vernon Fire Fighters Assn. v. City of Vernon* (1986) 178 Cal.App.3d 710, 722.) Moreover, the League offered evidence in the form of declarations from several officers who averred that they accepted their advanced pay grade positions with the understanding that they would be subject to the good cause standard set forth in the Manual and that they would be entitled to the security of remaining in that assignment according to that standard.

On the other hand, the City offered no evidence of a significant public purpose for the implementation of Special Order No. 47 sufficient to render it constitutional. "'[A] substantial impairment may be constitutional if it is "reasonable and necessary to serve an

23

important public purpose.'" [Citations.] In applying this standard, however, when the legislation at issue impairs public contracts, "'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. . . .'" [¶] 'Both the California and United States Supreme Courts have identified factors which may warrant legislative impairment of vested contract rights on the grounds of necessity: "(1) the enactment serves to protect basic interests of society, (2) there is an emergency justification for the enactment, (3) the enactment is appropriate for the emergency, and (4) the enactment is designed as a temporary measure, during which time the vested contract rights are not lost but merely deferred for a brief period, interest running during the temporary deferment." [Citations.]' [Citation.]" (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1154–1155.) There was no showing—either below or on appeal—that Special Order No. 47 protected any basic societal interest, that it was necessitated by any emergency, that it was appropriate to resolve any emergency or that it was designed to be temporary. Because Special Order No. 47 constituted a substantial impairment to the employment rights provided by the Manual, and the City offered no significant and legitimate purpose for the measure, we conclude the trial court properly determined that Special Order No. 47 was an unconstitutional impairment of contract.

## IV. The Trial Court Properly Declined to Order Specific Relief to Individual Officers.

When the trial court entered judgment in February 2012, it deleted a paragraph proposed by the League that referred to employees who were assigned to advanced pay grade or bonus positions prior to the adoption of Special Order No. 47 and provided: "The above-referenced employees reassigned or deselected from advanced pay grade or bonus positions after October 30, 2009 shall have their reassignment/deselection set aside and shall be reinstated to their respective former advanced pay grade and/or bonus position and assignment with corresponding pay and benefits with interest at the legal rate effective from the date of their reassignment/deselection, and continuing thereafter until the date of their reinstatement to such advanced pay grade and/or bonus positions."

24

On appeal, the League contends the trial court erred in refusing to order reinstatement, back pay and benefits.  In support of its contention, it relies primarily on *Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 402–403, where the court outlined the measure of damages available to an employee who had been dismissed without the benefit of the full range of due process rights.  (See also *Eureka Teacher's Assn. v. Board of Education* (1988) 202 Cal.App.3d 469, 475–476 [teacher's claim for back pay and fringe benefits deemed incidental to request for reinstatement]; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 843–844 [back pay deemed an appropriate type of "extraordinary relief" for demotion implemented without an administrative appeal].)

Each of the cases cited by the League involved a single employee seeking monetary relief as part of a remedy for a specific violation.  Here, however, as the City pointed out in its objections to the League's proposed judgment, the League offered no evidence of any particular officer's reassignment or deselection under Special Order No. 47.  The officers who submitted declarations in connection with the bench trial had not been reassigned or deselected under the new standard; each averred that Special Order No. 47 "will subject me to removal from my advanced pay grade position and loss of additional compensation based upon the discretionary decision of a Commanding Officer . . . ."  In his declaration, the League's counsel similarly suggested that action under Special Order No. 47 had not yet been taken, stating:  "There exist[] thousands of represented League members who occupied advanced pay grade/bonus positions before the implementation of Special Order No. 47 and continued to remain in such positions who are now subject to the new standard for removal in Special Order No. 47 as well as the deprivation of additional monetary compensation attendant to such positions."  Because the League offered no evidence to show that any officers had been deprived of any monetary compensation as a result of action under Special Order No. 47, the trial court properly struck the provision in the proposed judgment awarding damages.

## DISPOSITION

The judgment is affirmed.  Parties to bear their own costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

           FERNS

We concur:


_____, Acting P. J.

    ASHMANN-GERST


_____, J.

    CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.